[No. B209179. Second Dist., Div. Four. June 22, 2009.]

STEPHAN HAAH et al., Plaintiffs and Respondents, v.
DONGHYUK KIM, Defendant and Appellant.
PETER CHUNG, Plaintiff, v.
DONGHYUK KIM, Defendant.

**COUNSEL**

David D. Kim & Associates, David D. Kim, Matthew E. Karanian and Mark M. Higuchi for Defendant and Appellant.

Katten Muchin Rosenman, Helen B. Kim and Marisa G. Westervelt for Plaintiffs and Respondents.

OPINION

**WILLHITE, J.**—Under Corporations Code section 709 (section 709), "any shareholder or . . . any person who claims to have been denied the right to vote" may bring an action to invalidate the appointment or election of directors of a corporation. Stephan Haah and Jang Woo Lee brought such an action to invalidate the appointment or election of Donghyuk Kim (D. Kim), Won B. Keh (W.B. Keh), and Young S. Keh (Y.S. Keh) as directors of Galleria Plus, Inc. (GPI). The trial court granted Haah and Lee's petition, and D. Kim appeals from the judgment. He challenges the trial court's ruling on a demurrer, its finding that Haah and Lee had standing to bring an action under section 709, and its appointment of directors. We hold that D. Kim forfeited his contentions regarding the demurrer ruling and the appointment of directors. As to his contention that Haah and Lee did not have standing, we hold that section 709 allows persons who have entered into subscription agreements to file an action challenging the election of directors, and therefore Haah and Lee had standing to bring the present action. Accordingly, we affirm the judgment.

## BACKGROUND

Many of the facts regarding the formation and operation of GPI were hotly contested in the trial court. The trial court did not expressly resolve many of those disputes, and we do not intend by our recitation of the facts to resolve them. We set forth only those facts relevant to the issues on appeal.

A. *The Creation of GPI*

Sometime in 2005, Francis Key (Key) approached Haah, who was a well-known developer in the mid-Wilshire area of Los Angeles known as Koreatown, about the possibility of owning and operating a supermarket at the Equitable City Center Building under development in Koreatown. Haah worked with Key to develop and execute the market concept.[1] As part of the plan, Key formed a corporation, GPI, for the purpose of owning and operating the supermarket.

On June 13, 2005, Key, accompanied by Se Heon Yoon (S.H. Yoon) met with Yoon Han Kim (Y.H. Kim). Key asked Y.H. Kim, an attorney, to prepare and file articles of incorporation for GPI and a statement of information naming S.H. Yoon as the sole director and officer of GPI. Y.H. Kim prepared

---

[1] We note that D. Kim disputes that Haah had any involvement in the development of the market plan or GPI. According to D. Kim, Haah had no involvement in GPI until November or December of 2006. This assertion is contrary to a written agreement, signed by Key and Haah on October 19, 2006, discussed in footnote 3, *post.*

the documents as requested, and signed the articles of incorporation as the incorporator; S.H. Yoon signed the statement of information. Y.H. Kim assumed that Key had another attorney assisting him who would prepare the necessary documents to appoint S.H. Yoon as director. No such documents were prepared.

## B. *Key's Alleged Agreement with D. Kim*

In April 2006, S.H. Yoon left GPI and returned to Korea. At around that time, D. Kim became involved in GPI, assuming responsibility for running GPI's business operations, including opening and managing GPI's bank accounts. On April 27, 2006, Key and D. Kim went to Y.H. Kim's office, and Key asked Y.H. Kim to prepare a statement of information listing D. Kim as the sole director and officer of GPI.[2] D. Kim signed the statement of information. Both D. Kim and Y.H. Kim understood at that time that Key was the sole owner of GPI.

D. Kim asserts that he and Key then agreed that they would be equal partners in GPI, but that D. Kim would "legally" hold all of the shares of GPI. There is no written documentation of this alleged agreement.

## C. *Key's Agreements with Haah and Others*

There is, however, written documentation of several agreements Key entered into with Haah and other individuals. After Key secured a lease for the supermarket project in September 2006, he was unable to raise sufficient money to continue funding the company, so he enlisted Haah's assistance. He agreed to give Haah 25 percent of GPI's outstanding shares in exchange for Haah's assistance in securing a $1.5 million loan for GPI. He entered into a written agreement to that effect on October 10, 2006, individually and on behalf of GPI. The agreement warranted that Key was the owner of 100 percent of the shares of GPI. According to Haah, Key modified the agreement shortly thereafter to provide that Haah was to secure at least $2 million in cash rather than a $1.5 million loan. Although there is no writing evidencing this modification, the subsequent conduct of the parties is consistent with the alleged modification.

Haah, alone and with the assistance of James Seo, identified several potential investors for GPI. Two of them entered into contracts with Key: Christine Chung (C. Chung), who invested $500,000 in exchange for 20

---

[2] D. Kim asserts that S.H. Yoon elected him as sole director and then resigned as director. There is no contemporaneous written record of this alleged election. There is, however, a document that was prepared and allegedly signed by S.H. Yoon in May 2007, backdated to April 27, 2006, that purports to elect D. Kim as sole director of GPI.

percent of all outstanding shares on October 19, 2006, and Won B. Keh (W.B. Keh), who invested $1 million in exchange for 17.5 percent of the outstanding shares in December 2006. In each contract Key, who signed individually and on behalf of GPI, warranted that he owned 100 percent of the shares of GPI.[3]

### D. *Y.H. Kim Elects Key as Director, and Key Asks Haah to be Director Instead*

During negotiations regarding his investment, W.B. Keh requested the issuance of a stock certificate to evidence his 17.5 percent interest in GPI. To comply with that request, Key sought to complete the documentation necessary to allow GPI to issue stock certificates. To that end, he went back to Y.H. Kim, the incorporator of GPI, in December 2006. At Key's request, Y.H. Kim signed an "action by incorporator" electing Key as the director of GPI; the document was dated "as of" June 17, 2005. Almost immediately after obtaining the action by incorporator, Key asked Haah to act as sole director. Haah agreed, but only if Key obtained a revised action by incorporator designating Haah as sole director.

Key subsequently presented Haah with the original action by incorporator with Key's name whited out and Haah's name replacing it. Haah insisted that Key obtain a new action by incorporator. Later that same day, Key gave Haah another action by incorporator, which appeared to have been signed by Y.H. Kim, designating Haah as sole director.

### E. *Haah Enters into Agreements As Director of GPI*

In early January 2007, Michael Yoon (M. Yoon) and Lee each agreed to invest $500,000 in GPI in exchange for 70,000 shares of common stock (which constituted 7 percent of all outstanding common shares). They each entered into a stock purchase agreement with GPI, which was signed by Haah as director of GPI.

In return for Seo's help in identifying W.B. Keh, M. Yoon, and Lee as potential investors, Haah agreed to give Seo 3.5 percent of outstanding common shares as a commission, as memorialized in a net commission agreement between Seo and GPI, which Haah signed in his capacity as

---

[3] Key also entered into two additional contracts in which he agreed to issue shares to Haah and another individual to compensate them for their services assisting Key and GPI in securing the leasehold interests for the supermarket. The first, executed on October 19, 2006, gave Haah an additional 5 percent of the outstanding shares, and the second, executed on November 30, 2006, gave Joo Hyun Chung (J.H. Chung) 5 percent of the outstanding shares.

director of GPI. Haah also gave an additional 5 percent of outstanding common shares to J.H. Chung to satisfy a preexisting obligation.

Stock certificates, signed by Haah as secretary and president of GPI, were issued to Haah, Peter Chung (P. Chung) (who was designated by his mother, C. Chung), J.H. Chung, W.B. Keh, M. Yoon, Lee, and Seo.

## F. *Disputes Arise over Control of GPI*

Key died on April 19, 2007. Following Key's death, a dispute arose between Haah and D. Kim regarding control of GPI.

D. Kim told Haah that the action by incorporator designating Haah as director was a forgery. At some point, Haah agreed to prepare a new action by incorporator to be signed by Y.H. Kim that designated D. Kim as director, with the understanding that D. Kim would honor the agreements Key entered into with Haah, J.H. Chung, and the investors.

D. Kim then obtained Y.H. Kim's signature on an action by incorporator designating him director of GPI "as of" April 25, 2006. When D. Kim failed to execute the documents necessary to issue the stock certificates in accordance with Key's agreements, Haah asked Y.H. Kim to void the action by incorporator he had signed for D. Kim, on the ground that Y.H. Kim had resigned as incorporator in December 2006 after he elected Key as director. Y.H. Kim agreed, and on May 1, 2007, he voided the action by incorporator designating D. Kim as director.

On May 10, 2007, D. Kim, purportedly acting as the sole director of GPI, signed an action by unanimous written consent, which was backdated to April 27, 2006, stating that D. Kim was elected to the offices of president, secretary, and treasurer and that GPI was issuing 500,001 shares of common stock to D. Kim. That same day, he also purported to amend the articles of incorporation to authorize the issuance of two classes of stock, including 1,000,000 shares of convertible preferred stock (the original articles authorized the issuance of 1,000,000 shares of common stock). Five days later, D. Kim, acting as the sole director, purported to issue a corporate debenture to W.B. Keh and preferred stock to M. Yoon and Lee, in recognition of their investments in GPI. He also purported to elect W.B. Keh, M. Yoon, Lee, and Y.S. Keh to the board of directors. Those new board members then purported to ratify D. Kim's prior actions, although they reduced the number of shares issued to D. Kim. M. Yoon and Lee subsequently disassociated themselves from D. Kim, and on June 26, 2007, D. Kim, W.B. Keh, and Y.S. Keh voted to remove them from the board of directors. On that same day, the board authorized the issuance of 510,000 shares of common stock to Woori

Market Plus, Inc. (Woori Market), in consideration for $2 million in cash, $1.5 million in inventory, $1.5 million in equipment leases, and up to $2 million in loans.

In the meantime, on June 4, 2007, a meeting of shareholders noticed by Haah, P. Chung, and J.H. Chung was held. All of the people who entered into written agreements for GPI shares with Key or Haah (as director of GPI) attended in person or by proxy, except W.B. Keh. A total of 825,000 shares were voted renouncing D. Kim's actions and purporting to elect Haah, P. Chung, and Seo as the board of directors.

### G. *Lawsuits Are Filed*

Several lawsuits resulted from the dispute between D. Kim and Haah. In one of them, filed on behalf of GPI by the D. Kim-controlled board of directors against Haah and others (*GPI v. Haah*), Haah filed a cross-complaint against D. Kim and Y.S. Keh.[4] Although most of the claims Haah alleged were derivative claims on behalf of GPI, the original cross-complaint also alleged claims for removal of directors under Corporations Code sections 304 and 308. Haah subsequently dismissed the claims for removal, leaving only derivative claims and a claim for an accounting.

### H. *The Present Lawsuit*

On November 6, 2007, Haah filed a complaint against D. Kim, M. Yoon, Lee, W.B. Keh, and Y.S. Keh seeking to invalidate their election as directors under section 709. He later filed an amended pleading, calling it a first amended petition, against only D. Kim, W.B. Keh, and Y.S. Keh. Two days later, P. Chung filed an almost identical petition, which was consolidated with Haah's action. W.B. Keh and Y.S. Keh (the Kehs) filed a demurrer to Haah's first amended petition on the ground of another action pending, based upon Haah's cross-complaint in *GPI v. Haah*. Ten days before the date set for hearing on the demurrer, D. Kim filed a one-page document that states: "Donghyuk Kim joins the Demurrer filed by Won B. Keh and Young S. Keh to Stephan Haah's First Amended Petition to Determine Validity of Appointment and Election of Directors."

In its tentative decision on the demurrer (which was adopted as the final ruling), the court stated in a footnote: "The court also received a document from [D. Kim] styled as a 'joinder' to the demurrer. There is no provision in the CCP for a 'joinder,' and the court construes it merely as a cheerleading

---

[4] The day after the D. Kim-controlled board of directors filed the lawsuit against Haah, another action was filed by GPI (directed by Haah) against D. Kim and others.

effort." The court overruled the Kehs' demurrer. Shortly thereafter, Haah amended his petition again to add Lee as an additional petitioner.

Following briefing and submission of evidence by the parties, the court held a hearing on the amended petition. The court issued a tentative decision in which the court concluded that no one was validly appointed as director of GPI, but that Haah and Lee did not have standing to bring an action under section 709 because no shares were validly issued.[5] Over the course of the hearing, however, the court came to the conclusion that its standing analysis was too narrow. It found that Haah and Lee had an equitable interest in GPI as beneficial shareholders in light of their written agreements, and the court determined that interest was sufficient to give them standing to bring an action under section 709. Finding that D. Kim was not validly appointed or elected as a director of GPI, the court granted the petition.

Haah and Lee subsequently filed a third amended petition seeking the appointment of directors, and moved for an order appointing Haah, Lee, and others directors of GPI. Following negotiations, an agreement was reached regarding the appointment of directors. At a hearing attended by counsel for Haah and Lee, D. Kim, and Woori Market and its sole shareholder, Joshua Ko, counsel for Woori Market and Ko told the court that the parties had reached an agreement, and that "we" agreed that Haah, Ko, and Richard Bertsch are to be the directors. D. Kim's counsel did not object to this representation. Haah submitted a judgment in accordance with the court's prior ruling on the validity of D. Kim's election and the parties' agreement regarding the appointment of directors, which the court signed. D. Kim timely filed a notice of appeal from the judgment.

## DISCUSSION

D. Kim contends on appeal that (1) the trial court erred by overruling his demurrer; (2) the trial court erred by granting the petition because Haah and Lee lacked standing under section 709; and (3) the trial court abused its discretion by appointing directors. He has forfeited his first and third contentions, and is incorrect as to his second.

### A. *Ruling on the Demurrer*

D. Kim argues that the trial court erred by overruling his demurrer, but he did not file a demurrer. Rather, the Kehs filed a demurrer, and D. Kim filed a document in which he purported to join in the Kehs' demurrer. The trial court

---

[5] Although the tentative ruling states that the operative pleading is the first amended petition, it is clear that the court was referring to the second amended petition filed by Haah and Lee.

found there was no provision in the Code of Civil Procedure for a "joinder" to a demurrer, and treated D. Kim's document as "a cheerleading effort." It then overruled the Kehs' demurrer.

D. Kim's argument on appeal addresses only the merits of the Kehs' demurrer; it does not address the court's rejection of D. Kim's "joinder" in the demurrer. Because D. Kim does not contend on appeal that the court's rejection of his "joinder" was error, he has forfeited any claim of error with regard to the court's ruling on the demurrer. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273] ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."].)

B. *Standing*

D. Kim challenges the trial court's finding that Haah and Lee had standing to bring a section 709 action based upon its conclusion that Haah and Lee were beneficial shareholders. He contends that the court's finding that no shares were validly issued precludes a finding of standing under section 709. He bases his argument on the language of section 709—which authorizes the filing of an action "by any shareholder or by any person who claims to have been denied the right to vote" (Corp. Code, § 709, subd. (a))—and the statutory definition of "shareholder." That definition, found in Corporations Code section 185, provides: " 'Shareholder' means one who is a holder of record of shares." Because no shares were issued, neither Haah nor Lee is a holder of record of GPI shares, and therefore D. Kim argues they do not have standing to bring the instant action. His reading of section 709 is too narrow.

First, D. Kim's argument fails to take into account the nature of an action to invalidate an appointment or election of directors. As several courts have noted, courts deciding such actions are given wide discretion to consider all matters relevant to the determination, and are not limited by technical or procedural issues. (See, e.g., *Lawrence v. I. N. Parlier Estate Co.* (1940) 15 Cal.2d 220, 227 [100 P.2d 765] ["an action under [a predecessor to section 709] is in the nature of an equitable proceeding in which the court will consider all matters necessary to a proper determination of the validity of the contested election"]; *Goss v. Edwards* (1977) 68 Cal.App.3d 264, 271 [137 Cal.Rptr. 252] ["An action to defeat a corporate election is a broad-based equity action in which the court may examine the entire transaction without being limited to technical or procedural issues and may adjust the rights of

the parties to do justice among them."].) Thus, courts have granted standing to shareholders who were not technically shareholders of record at the time of the challenged election, but who nevertheless claimed they were shareholders entitled to vote. (See, e.g., *Lawrence v. I. N. Parlier Estate Co., supra*, 15 Cal.2d 220; *Wright v. Cent. Cal. C. W. Co.* (1885) 67 Cal. 532 [8 P. 70].)

Second, the standing provision of section 709—"any shareholder or . . . any person who claims to have been denied the right to vote"—must be understood in the context of the statute's history. Before section 709 was enacted in 1975, actions to challenge the election or appointment of a director of a domestic corporation were governed by Civil Code former section 315 (Stats. 1931, ch. 862, § 2, p. 1763, amended by Stats. 1933, ch. 533, § 23, p. 1371) (former section 315), and then by Corporations Code sections 2236 to 2238 (Stats. 1947, ch. 1038, §§ 2236–2238, pp. 2347–2348) (former sections 2236–2238). Former section 315 and former section 2236 provided that an action to challenge the appointment or election of a corporate director could be brought by "any shareholder."[6] At that time, however, the definition of "shareholder" included "a subscriber to shares in cases in which no certificates are outstanding." (See Civ. Code, former § 278, added by Stats. 1931, ch. 862, § 2, p. 1763, amended by Stats. 1933, ch. 533, § 1, p. 1358; and Corp. Code, former § 103, enacted by Stats. 1947, ch. 1038, § 103, p. 2311 (former section 103).) A "subscription" is "any agreement to take stock in a corporation" (*Brown v. North Ventura Road Dev. Co.* (1963) 216 Cal.App.2d 227, 233 [30 Cal.Rptr. 568])—such as the agreements Haah and others entered into with Key.

In 1975, there was "a total revision of the basic California Law relating to the organization and internal operation of corporations and their relationships with investors." (Cal. Dept. of Corporations, Enrolled Bill Rep. on Assem. Bill No. 376 (1975–1976 Reg. Sess.) Sept. 12, 1975, p. 1.) As the Department of Corporations reported in its Enrolled Bill Report on Assembly Bill No. 376, although the revision would "[e]ffect[] major changes" in certain areas (none of which are relevant to the instant action), "[i]n large measure, the bill's provisions are merely a reorganization of the provisions of the existing law, with changes for the purpose of clarification and streamlining." (*Ibid.*)

As part of the bill, former sections 2236–2238 were consolidated into section 709, with the standing requirement revised to include both "any shareholder" as well as "any person who claims to have been denied the right

---

[6] Former section 315 originally provided that such an action could be brought by "a shareholder." (Stats. 1931, ch. 862, § 2, p. 1779.) In 1933, the statute was amended to provide, among other things, that the action could be brought by "any shareholder." (Stats. 1933, ch. 533, § 23, p. 1371.)

to vote." (§ 709, subd. (a), added by Stats. 1975, ch. 682, § 7, p. 1516.) It appears that this revision was made to take into account the narrower definition of "shareholder" that was enacted as part of the same bill. (Corp. Code, § 185, added by Stats. 1975, ch. 682, § 7, p. 1516 [" 'Shareholder' means one who is a holder of record of shares."].) In light of the bill's intent to simply reorganize, clarify, and streamline the existing law rather than make substantive changes, the revised statutory scheme should be read in a manner consistent with the prior statutory scheme.

The addition of the phrase "any person who claims to have been denied the right to vote" to the standing provision of section 709 indicates, at a minimum, that the Legislature did not intend to limit standing only to those whose shares were properly issued and recorded in the corporation's books. Indeed, by according standing to any person who *claims* to have been denied the right to vote, it appears that the Legislature intended to significantly lower the barriers to bringing an action under section 709, and allow the court to consider the merits of the action without first determining whether the petitioning party did in fact have a legal right to vote.

In view of the history of the statutes governing contested elections, we conclude that the phrase "any person who claims to have been denied the right to vote" includes those who have entered into agreements to take shares in the corporation—like the agreements in the present case—but who have not yet been issued those shares. Accordingly, we hold that the trial court correctly found that Haah and Lee had standing to bring the present action. Because D. Kim does not challenge the trial court's finding that his election as director was invalid, we affirm the court's judgment granting the petition.

## C.  *Appointment of Directors*

In addition to invalidating D. Kim's election as director, the judgment also appointed new directors. As noted above, this appointment was made following a hearing at which counsel for Woori Market and Ko informed the trial court that the parties had agreed to the appointment. D. Kim was represented by counsel at that hearing, and did not object to Woori Market's counsel's statement or to the appointment. By failing to object in the trial court to the appointment, D. Kim has forfeited any objection he might have. (*Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1117 [39 Cal.Rptr.2d 535] ["An appellate court will not consider procedural defects or erroneous rulings where an objection could have been, but was not, raised in the court below."].)

## DISPOSITION

The judgment is affirmed. Haah and Lee shall recover their costs on appeal.

Epstein, P. J., and Manella, J., concurred.