Filed 12/29/25  Jin v. Yan CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHINO JIN,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>JIE YAN,<br><br>Defendant and Respondent. | B333809<br>(Los Angeles County<br>Super. Ct. No. 23STCV13341) |

APPEAL from an order of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Bryan Cave Leighton Paisner, Jed Patrick White, David Harford, Robert Hoffman, Elliott Averett; Knez Law Group and Matthew J. Knez for Plaintiff and Appellant.

Shulman Bastian Friedman & Bui, Leonard M. Shulman, Franklin J. Contreras, Jr. and Bryan Whitmer-Cabrera for Defendant and Respondent.

In this case, we must decide a surprisingly difficult question: Who owns Starbridge Group, Corp. (Starbridge), the majority owner of a hotel near the Ontario Airport (Hotel)? After conducting a hearing and weighing evidence, the trial court ruled that defendant and respondent Jie Yan, and not plaintiff and appellant Shino Jin, owned Starbridge. We affirm the trial court's decision.

Under Corporations Code section 709 (section 709), a shareholder can commence an equitable proceeding to contest the validity of a corporate election. Shino Jin brought such action to invalidate the appointment of Jie Yan as director of Starbridge and the removal of Shino's husband, Jianhua Jin,[1] and his related companies from corporate management. The shareholder vote followed Yan's purchase of Starbridge shares from Jianhua's relative, Shengjing Lu, and Lu's company, Starry Palace Limited (Starry). In her petition, briefing, and evidentiary submissions, Shino asserted she, not Yan, was majority owner of Starbridge through a company called American Asset Management Group Inc. (AAMG). The trial court did not find this assertion credible.

On appeal, Shino contends the trial court committed structural error by refusing oral testimony and cross-examination. She also challenges the sufficiency of evidence supporting the finding Yan held a valid shareholder vote after purchasing Starbridge, as well as evidentiary rulings regarding two declarants. Shino's arguments lack merit.

---

[1] We refer to Shino Jin, her husband Jianhua Jin, and others who share the same last name by their first name. We intend no disrespect.

## BACKGROUND

On June 9, 2023, Shino filed a section 709 petition to invalidate an October 2021 Starbridge shareholder vote held by Yan after her purchase of Starbridge shares. At a hearing setting conference, the trial court directed the parties to brief the issues with supporting evidence. Shino filed opening and reply briefs. Yan filed an opposition brief. Below we discuss Starbridge's complex and disputed 11-year history as set forth in the petition, briefs, and record evidence.

### A.  Individuals and Corporate Entities

On December 6, 2012, Jianhua filed articles of incorporation for Starbridge Investment LLC (LLC) in this state. The same month, the LLC was capitalized through wire transfers from AAMG ($10.9 million total), Pt. VicValuta ($4.68 million total), and Skylight Holdings Limited (Skylight) ($1.32 million total). The LLC used this money and other deposits[2] to purchase the Hotel for $18.5 million.

Notwithstanding this capitalization, the LLC's initial corporate documents listed the following three member-owners: Starbridge (60% owner), Lancer Solution Corp. (Lancer) (30% owner), and Morgan Holding Group, Inc. (Morgan) (10% owner). Members were permitted to seek the return of capital contributions upon approval of majority shareholders. No member could assign or sell any membership interest without prior approval of majority shareholders.

---

[2]  Velocity Investment Group, Inc. (Velocity), a company owned by Jianhua, made three earnest money deposits totaling $3.9 million. Shino's petition alleges Velocity advanced this money on AAMG's behalf. The parties do not make arguments based upon these deposits.

Jianhua is sole owner-shareholder of Morgan and Lancer. Jianhua's relative, Lu, is sole owner-shareholder of Skylight and Starry.[3] Lu also contributed the funds from Pt. VicValuta. Jianhua or Shino own AAMG.

In March 2013, Jianhua filed articles of incorporation of Starbridge in Nevada. These articles identified 1,000 issued shares priced at $100 per share. A share certificate, corporate tax return (fiscal year 2012–2013), and October 2013 Starbridge Resolution confirmed Starry owned 100% shares in Starbridge.[4] The 2013 Starbridge Resolution also identified a man named Pakshu Chan as Starbridge's President, who possessed powers of management subject to shareholder approval.

Yan is a real estate agent. After negotiating a failed Hotel sale in September 2021, Yan agreed to pay Starry $2 million for 1,000 Starbridge shares. Yan paid this amount through her business associate, Mingzhe Li. Li's payment was received by another intermediary, Bo Chen, and an affiliated company called Fu Bang Group Corp. (Fu Bang Group).[5]

---

[3]     At the time of these proceedings, Lu and another person associated with funding the LLC and Hotel, Rongji Chan, were "detained in China" and unable to participate in the proceedings.

[4]     The October 2013 Starbridge Resolution, signed by Lu and Jianhua, ratified a Property Rights Affirmation Agreement executed the same day between Starry and another company owned by Jianhua, Black King (Global) Investment Group Limited (hereinafter "Black King"). The resolution and agreement confirmed Starbridge was (1) fully owned by Lu through Starry; (2) 60% owner of the LLC; and (3) "[r]esponsible for [the LLC's] entire capital contribution." The Hotel comprises one of several "real estate properties" Black King and its subsidiaries (Lancer and Morgan) purchased for Starry.

[5]     Bo Chen's husband owns Fu Bang Group.

4

## B.     The Dispute:  Starbridge Ownership and Voting Rights

The parties' dispute arose in October 2021 when Yan, as sole Starbridge shareholder, held corporate meetings and voted herself Director and removed Jianhua from management and Morgan as a proxy.  Relying on a set of corporate documents purporting to amend Starbridge's ownership in 2014, Shino alleged Yan's election was invalid because she did not own the majority interest in Starbridge.  Yan disputed Shino's theory and the documents on which she relied.

### 1.     *Shino's Opening Brief and Supporting Evidence*
#### a. *Capital Contributions and Basis for Amendments*

In her opening brief, Shino argued she personally capitalized the LLC through AAMG with the understanding that her husband Jianhua's relative, Lu, would repay her contributions.  The initial corporate documents of Starbridge were drafted "in anticipation of the initial arrangement that Mr. Lu *was supposed to* fully fund the purchase of the Hotel in 2012."  When Lu informed Shino and Jianhua he could not refund her contributions in 2013, and after the LLC returned $3 million to Lu in 2014, Shino and Lu executed various documents purporting to amend Starbridge's ownership.  These documents (the Amending Documents) include a 2013 Starbridge Shareholder Agreement, various 2014 LLC Resolutions and Starbridge Meeting Minutes, and a 2021 Starbridge Resolution.

In declarations, Shino and Jianhua averred Shino and Lu personally executed the Amending Documents inside Lu's Fuzhou, China home.  Jianhua was "long-term" acquaintances with Yan, Yan's ex-husband (and Jianhua's realtor) Ray Cai, and

5

Bo Chen. By trade, Shino was a schoolteacher and Jianhua managed schools in China. The Hotel was Jianhua's first American investment. Jianhua admittedly made "inconsistent statements" about Starbridge ownership in various corporate and underwriting documents.

> b.    *The Amending Documents*

The 2013 Starbridge Shareholder Agreement, executed in December 2013, ratified the issuance of 20,000 shares at $1,000 per share. AAMG owned 14,000; Starry owned 6,000. These shares would be adjusted proportionately if any shareholder was returned capital. Any share transfer was conditioned on shareholder consent and rights of first refusal.[6]

The 2014 LLC Resolutions and Starbridge Meeting Minutes, executed in August 2014, authorized the return of $3 million from the LLC to Starbridge, and in turn to Starry, in exchange for the following changes in LLC ownership: 45.67% Starbridge; 40.75% Lancer; and 13.58% Morgan.

The 2021 Starbridge Resolution, executed in March 2021, ratified a set of bylaws to correct a drafting error associated with designating Starbridge as a California corporation instead of a Nevada corporation. In this resolution, Shino is listed as the "'Sole Director'" and "'Majority Shareholder.'"

Handwritten signatures of Shino and Lu appear on these Amending Documents.[7]

---

[6]    Starbridge did not formally alter its outstanding shares until September 12, 2023, when it filed a Certificate of Amendment in Nevada.

[7]    Another corporate document executed by the LLC in August 2021, a First Amendment to the LLC's Operating Agreement, further

c. *WeChat Text Messages*

In undated WeChat text messages, Yan questioned Lu about the $3 million remittance from the LLC. Yan informed Lu of Shino's allegations (i.e., that Lu received $3 million in exchange for reducing Starbridge ownership in the LLC). Lu confirmed receipt of $3 million, but stated it was a "return of investment, not a transfer of ownership of shares."

d. *Hotel Franchise Licensing and Construction Loan*

In January 2016, Jianhua entered the LLC into a Franchise License Agreement with Holiday Hospitality Franchising. As licensee, the LLC affirmed its ownership interests as follows: 60% Starbridge, owned 100% by Starry and Lu as sole shareholder; 30% Lancer, owned 100% by Worldwide Capital Development Investment Limited; and 10% Morgan, owned 100% by Black King and Jianhua as sole shareholder. The Franchise License required construction and renovations.

Between 2019 and 2023, the LLC by and through Jianhua entered into various loan and extension agreements with Cathay Bank for a $15 million construction loan. Jianhua, his wife (Shino), and Starbridge are listed as guarantors for the borrower LLC. The loan agreement was ratified by LLC resolution executed by Jianhua in June 2023. In various underwriting

---

amended the LLC's ownership, voting, and net profits/losses as follows: 42.05% Starbridge; 37.51% Lancer; 12.50% Morgan; and 7.94% La Moda (Ontario Hotel) EB5 Investment LP (hereinafter "La Moda"), a new LLC member. Jianhua signed the LLC First Amendment as CEO of Starbridge, Lancer, Morgan, and La Moda.

documents (closing certificates) to Cathay Bank, Jianhua verified Starbridge's 60% ownership in the LLC.

e. *Challenges to Yan's Stock Purchase*

Shino argued Yan did not purchase a majority interest in Starbridge. In support, she averred:  (1) the purchase was circular and fraudulently consummated through intermediaries; (2) the purchase violated the 2013 Starbridge Shareholder Agreement, which required member approval and the exercise of rights of first refusal; and (3) even if lawful, Yan's shares constituted a minority interest under the Amending Documents.

In support, Shino submitted 2023 deposition testimony of Yan's associate, Mingzhe Li.  Without issuing a promissory note, Li wired $2 million to Fu Bang Group as a loan to Yan.  At Lu's request, Fu Bang Group issued a deed of trust on its own property to secure the transaction.  Yan used the borrowed money to purchase 1,000 Starbridge shares.

A certified public accountant reviewed Yan's purchase transaction and submitted a declaration finding it "heavily discounted," "unusual," and indicative of fraud.  The accountant questioned Yan's due diligence.  A week after Li wired the purchase money, Fu Bang Group disbursed $1.92 million "to entities or individuals" related to Yan and Fu Bang Group, including WWL Holding, LLC and another individual.

2. *Yan's Opposition and Supporting Evidence*
a. *Challenges to Shino Ownership and Capital Contributions*

Yan argued Shino could not contest the shareholder vote because she was not a valid shareholder.  Until recently (see fn. 6

8

*ante*), all corporate and underwriting documents confirmed Starbridge's share amount (1,000) and ownership interest (100% Starry). Jianhua attempted to "paper over" these documents in a fraudulent attempt to alter Starbridge's ownership, making it appear that his wife, Shino, was the majority shareholder when she was not.

Yan also argued that the Amending Documents on which Shino claimed an ownership interest were forged. After reviewing 14 comparison documents of Lu's signatures, a handwriting expert submitted a declaration finding a "strong probability" Lu did not personally sign the 2013 Starbridge Shareholder Agreement or 2021 Starbridge Resolutions. The expert could not opine on the 2014 Starbridge Meeting Minutes because it contained an "identical" signature to those compared.[8]

In their own 2023 depositions, Jianhua testified he formed AAMG and brought $20 million of his "own money" to America, while Shino testified, in contradiction, that the money used to fund the LLC through AAMG was hers. Neither could provide details (banks, accounts, funds, etc.) regarding AAMG's funding. Jianhua admitted the funds AAMG used to fund the LLC were in its account for just "several days before it [was] then wired" to the LLC. Shino could not explain why, if she were majority Starbridge owner, Starbridge's ownership interest in the LLC would be reduced (60% to 45%) in exchange for Lu's $3 million payment.

AAMG bank records provided that approximately $8.5 million was wired into its account between December 11 and 14, 2012—the same period when AAMG helped capitalize the

---

[8]     This suggested the signature was transferred to or from the document.

9

LLC. Of this money, Pt. VicValuta, which was associated with Lu, wired $4.1 million.

### b. *Lu Declarations*

In declarations signed in November and December 2021 and submitted in prior litigation between the parties, Lu averred Jianhua concocted "a scheme to steal money and other assets from the LLC" and the Hotel. Lu was the "ultimate controller" of Starbridge until he liquidated shares in October 2021. The only capitalization agreement was memorialized in the 2012 LLC Operating Agreement and 2013 Property Rights Affirmation Agreement. Lu denied signing the 2014 Starbridge Meeting Minutes, denied any agreement to reduce Starbridge's 60% ownership interest in the LLC, and denied reassigning shares to Shino.

### c. *Bo Chen Declaration*

Bo Chen submitted a declaration in support of Yan. Bo Chen has known Jianhua for over 20 years and a businessman named Rongji Chen, one of the richest men in the Fujian Province, for five years. Based on her "long history" and personal knowledge of Jianhua's business affairs, Bo Chen did not believe Jianhua or Shino provided funds to capitalize the LLC or Hotel. In support, Bo Chen discussed Jianhua's prior complaints "about failed businesses and projects that were shut down."

In June 2021, Rongji told Bo Chen he was frustrated at Jianhua for not sending him and Lu Hotel profits. Following conversations with Yan, Li, Cai, Lu, and a personal representative of Rongji, Bo Chen assisted in structuring a deal to purchase the Hotel involving Lu, Li, and Li's company, USA

10

BAK LLC (BAK).  That transaction was cancelled when questions arose about Lu's ability to sell the Hotel.

After the failed sale, Rongji asked Bo Chen to speak with Jianhua and ask for his cooperation with Rongji and Lu.  In meetings, Jianhua admitted to Bo Chen that Rongji funded the Hotel's purchase and owned 60% of the Hotel.  When Jianhua stopped cooperating with Rongji and Lu, Bo Chen was asked to assist the sale of Starbridge shares to Yan for $2 million.  Following Li's $2 million transfer to her husband's company (Fu Bang Group), Bo Chen was directed to remit money to Rongji and Lu.

### d.     *Yan's Stock Purchase*

In her own deposition testimony and supporting declaration, Yan claimed she assisted in the (attempted) Hotel transaction between Lu and BAK.  That deal arose out of discussions between Lu's associate, Bo Chen, and Cai.  Cai introduced Bo Chen to Yan, who introduced Li as a prospective investor.  The deal fell through after Lu could not provide records of his capital contributions to the LLC or establish his ownership rights therein.

A month after the failed transaction, Lu approached Yan to inquire about her interest in purchasing Starbridge, which held 60% ownership in the LLC.  After reviewing the initial LLC documents (the 2012 Operating Agreement and the 2013 Property Rights Affirmation), Yan believed Lu fully owned Starbridge and was majority owner of the LLC.  Based on the Hotel's appraisal ($21 million); debt ($15 million); and Starbridge's 60% ownership interest, Yan calculated an overall Starbridge share price of $3 million and negotiated Lu down to

$2 million. Yan and Lu memorialized the deal in a signed Purchase Agreement. Starry issued a Stock Assignment verifying the sale to Yan. Li and Yan denied recouping any part of the $2 million Li transferred to Fu Bang Group.

### 3. *Shino's Reply Brief and Evidence*

Shino argued Yan's handwriting expert was unreliable. In support, her own expert submitted a declaration discussing his review of the Amending Documents. The expert opined that the signatures provided insufficient detail because they were machine-produced.

Shino also argued Bo Chen's discussion of capitalization was based on inadmissible hearsay. Shino disputed Bo Chen's statements and submitted a new declaration by Rongji's son, Pakshu Chan.

## C. **The Ruling and Judgment**

After posting a 28-page tentative ruling, the court heard extensive argument by the parties at the section 709 hearing. Following argument, the court issued evidentiary rulings, adopted its tentative ruling, and denied Shino's petition.

In its ruling denying the petition, the court found Shino's request to "follow the money" to be particularly difficult. In light of Shino and Jianhua's background, their inability to provide information regarding assets used to fund AAMG and the LLC, and conflicting statements by Bo Chen, the court found "strong reason to disbelieve that Shino (or Jianhua) put up $10.9 million" to fund AAMG and the LLC. The court further found the Amending Documents not genuine, and as a result, any ownership changes in favor of Shino inoperative. Shino's theory

of corporate restructuring "does not make sense" if, as Shino alleged, she held a controlling 70% interest in Starbridge.[9]  Lu denied this restructuring while confirming his receipt of $3 million in return capital.  While noting Yan's stock purchase was "odd" and "concern[ing]," the court found Lu and Yan's declarations verified the sale.

Based on these findings, the court held that "Lu was the sole owner of Starbridge [ ] and 60% owner of [the] LLC and the Hotel until he sold his interest to Yan.  Jianhua . . . concoct[ed] fictitious documentation that Shino owns the vast percentage of Starbridge [ ].  This was false.  Yan is the 100% owner of Starbridge [ ] and Shino had no right to vote at the October 2021 meeting."  The court entered judgment in Yan's favor.

## D.    Post-Ruling Evidence

Following the court's ruling, an attorney representing Lu and Rongji filed an ex parte application to intervene.  In supporting declarations, both declared that Yan was attempting to steal Starbridge and the Hotel.  In an attached cross-complaint, Lu, Rongji, and Pakshu alleged they owned Starbridge through Starry.  They sought an order vacating all corporate actions taken by Yan and declaring them "the rightful owners" (capitalization omitted) of Starry's shares in Starbridge.  The court denied the ex parte application "in favor of filing a separate lawsuit" to presumably resolve their own disputes with Yan.

---

9       The trial court reasoned, "If Lu's interest was supposed to be reduced, the reduction should have been in his (Starry's) ownership interest in Starbridge [ ], not a reduction of Shino's own interest in [the] LLC."

13

## DISCUSSION

Shino raises two contentions on appeal. First, she contends the trial court erred by refusing live witness testimony and cross-examination at the section 709 hearing. Second, she contends insufficient evidence, including evidence improperly admitted or excluded by the court, supports the finding Yan lawfully purchased Starbridge and held a valid shareholder vote.

### A.       Governing Law: Section 709

"Upon the filing of an action therefor by any shareholder or [person claiming] to have been denied the right to vote, the superior court of the proper county shall try and determine the validity of any election or appointment of any director of any domestic corporation, . . ." (§ 709, subd. (a).) Absent good cause, the court must "enter an order fixing a date for the hearing" on a section 709 petition within five days to determine any person(s) entitled to office, to order a new election, or to determine "the validity of the issuance of shares and the right of persons to vote and may direct such other relief as may be just and proper." (§ 709, subds. (b), (c).)

Section 709 proceedings are broad, equitable, summary in nature, and designed to avoid cumbersome review by writ of quo warranto. (*Morrical v. Rogers* (2013) 220 Cal.App.4th 438, 454 (*Morrical*); *Shahin v. Wawro* (1982) 136 Cal.App.3d 749, 753–754; see *Boericke v. Weise* (1945) 68 Cal.App.2d 407, 410; *Guaranty Loan Co. v. Fontanel* (1920) 183 Cal. 1, 8; see also 2 Fletcher, Cyclopedia of the Law of Corporations (September 2025) § 369; cf. *Greb v. Diamond Internat. Corp.* (2013) 56 Cal.4th 243, 266, fn. 31 [Fletcher is "the leading treatise of the day"].) Courts retain wide discretion to consider all matters relevant to any section 709

14

determination "and are not limited by technical or procedural issues." (*Haah v. Kim* (2009) 175 Cal.App.4th 45, 53 (*Haah*); see also *Lawrence v. I.N. Parlier Estate Co.* (1940) 15 Cal.2d 220, 227 [discussing predecessor statute].)

Like other equitable proceedings, section 709 and the authorities from which it derives contemplate an expedited hearing or bench trial. (*Morrical*, *supra*, 220 Cal.App.4th at p. 458; *Caira v. Offner* (2005) 126 Cal.App.4th 12, 26, fn. 8; see *Rincon EV Realty LLC v. CP III Rincon Towers, Inc.* (2017) 8 Cal.App.5th 1, 19.)

As the parties observe here, "the meanings of the terms 'trial' and hearing' can vary depending on the particular context in which they are used and can, in certain circumstances, overlap." (*Conservatorship of Joseph W.* (2011) 199 Cal.App.4th 953, 966.) Section 709 includes both terms. Because these terms are "'taken from the practice in equity procedure, and correspond[ ] to the term "trial," as used in cases at law,'" they signify "'the consideration and determination of a cause by the court or by a judge, as distinguished from a trial of a cause, which is a term more properly predicated of its determination by a jury. [Citations.]' ([*Niles v. Edwards* (1892)] 95 Cal. [41,] 43; see also *Schlessinger v. Rosenfeld, Meyer & Susman* (1995) 40 Cal.App.4th 1096, 1105 [an arbitrator's duty to 'hear' evidence under section 1286.2, subdivision (e), does not require the oral presentation of evidence or live testimony].)" (*Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1248.)

## B.    Standards of Review

In the trial court, a section 709 petitioner must overcome presumptions of regularity and legality to establish an invalid

15

election.  (*Shamel v. Lite Products Sales, Inc.* (1955) 131 Cal.App.2d 33, 36; *Michaels v. Pacific Soft Water Laundry* (1930) 104 Cal.App. 366, 368.)

On appeal, we review section 709 determinations for abuse of discretion.  (*Garnier v. Garnier* (1967) 248 Cal.App.2d 255, 259.)  "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."  (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479.)  When "'evaluating the *factual basis* for an exercise of discretion,'" we apply substantial evidence, and must "'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.]"  (*In re Caden C.* (2021) 11 Cal.5th 614, 640–641 (*Caden C.*).)

## C.  Shino Did Not Timely Request Oral Testimony or Cross-Examination

Shino contends the trial court structurally erred by refusing live witness testimony or cross-examination at the section 709 hearing.  Yan contends Shino failed to heed the court's instructions.  We agree with Yan.

### 1.  *Relevant Background*

Months before holding the section 709 hearing, the court held a hearing setting conference.  There, the court ordered a briefing schedule to proceed "on paper like an oral argument just like a noticed motion."  Shino's counsel raised "a logistical issue" on two witnesses coming from China.  The court responded: "They don't testify live . . .  All they have to do is sign

16

declarations." When the court stated it did not take live testimony, counsel inquired, "So how do I challenge?" and "I'm not going to have an opportunity to cross-examine[?]" The court replied, "It's a summary proceeding" and stated:

> "Here is the caveat. You have your 709 hearing. Basically[,] I decide the credibility issues based on the details and the reasonableness of the declarations. . . .
> "If at the hearing I can't tell who is lying on a key issue, only then would I permit live testimony. But in 27 years on the bench, I feel like I'm pretty good as ascertaining credibility from declarations and the reasonableness of the occurrence of events."

The court informed counsel he could argue the issues and request to cross-examine Yan's witnesses at the hearing if needed. "[I]f you say, you know, 'I'm losing, Judge, because you can't tell that they are lying, and I really, really, really want to cross-examine so-and-so,' you know, you can make that pitch at the hearing."

No requests were made for oral testimony or cross-examination at the section 709 hearing.

2. *Analysis*

"[S]ometimes complex factual disputes, not readily amenable to summary proceedings, may require resolution when issues . . . underlie [an] electoral contest" under section 709. (*Morrical*, *supra*, 220 Cal.App.4th at p. 459.) "Trial judges . . . have ample inherent supervisory and administrative power to """"to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council"""" and ""exercise reasonable control over all proceedings connected with

17

pending litigation . . . in order to insure the orderly administration of justice.'" [Citation.]" (*Id.* at pp. 459–460.)

Here, Shino fails to demonstrate how the court's directions prevented her from creating an adequate record or receiving a "fair hearing on the merits." (*Morrical, supra*, 220 Cal.App.4th at p. 460.) Shino was informed she could request live witnesses and seek cross-examination at the section 709 hearing. The court confirmed it would consider live testimony to settle outstanding credibility issues and told Shino she could "make [a] pitch" to cross-examine Yan's witnesses.

Shino did not heed these directions. Instead, she based her arguments on the evidence she submitted—more than 2,000 pages of declarations, deposition testimony, and documents. Shino raises no argument disputing the suitability of this evidence. (See Code Civ. Proc., §§ 2002, 2009, 2015.5; Cal. Rules of Court, rule 3.1306(a).) Absent an objection to "their use in evidence, a use in which" Shino participated (*In re Reilly's Estate* (1947) 81 Cal.App.2d 564, 570), she cannot now be held to complain about it. (See *Eddy v. Temkin* (1985) 167 Cal.App.3d 1115, 1120–1121.)

To the extent Shino contends section 709 required a full and complete hearing, she provides no authority requiring it. Some of the cases Shino cites included live testimony (*Morrical, supra*, 220 Cal.App.4th at pp. 449, 459; *Colburn Biological Institute v. De Bold* (1936) 6 Cal.2d 631, 644), some evidentiary submissions (*Haah, supra*, 175 Cal.App.4th at p. 52; *Wright v. Central California Colony Water Co.* (1885) 67 Cal. 532, 533–535), and none addressed the requirement of calling oral

18

testimony or cross-examination.[10]  "It is axiomatic that cases are not authority for propositions that are not considered." (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043.)  On these facts, we reject Shino's first contention of error.

## D.	Substantial, Admissible Evidence Supports the Court's Findings

Next, Shino contends insufficient evidence supports the finding Yan owns 100% of Starbridge Group and that Shino had no right to vote at the October 2021 meeting.  In support, Shino relies on alleged evidentiary errors made by the trial court in connection with declarations by Bo Chen and Pakshu Chan.

### 1.	*Sufficient Evidence Supports the Trial Court's Findings*

We conclude sufficient evidence supports the conclusion Shino had no right to vote at the Starbridge shareholder meeting.

According to the formation and capitalization of Starbridge, Lu held 1,000 shares, constituting 100% of outstanding shares at the time of Yan's purchase, through his company Starry.  The

---

[10]	Additional authorities on which Shino principally relies are inapposite.  (E.g. *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1233–1234 ["where there is no corroborating physical evidence to assist" student disciplinary proceedings, the adjudicator "must have the ability to observe the demeanor of those witnesses" in reaching its decision]; *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1352–1356 [local rule calling for declarations in lieu of direct testimony violated statutes governing contested marital dissolution trial]; *Fremont Indemnity Co. v. Workers' Comp. Appeals Bd.* (1984) 153 Cal.App.3d 965, 971 [parties to Worker's Compensation Appeals Board action must inspect and rebut evidence].)

2013 Starbridge articles of incorporation, related share certificate, and 2012–2013 corporate tax returns confirm this share amount and ownership percentage. The 2013 Property Rights Affirmation Agreement and 2013 Starbridge Resolution confirm that all LLC "capital contributions" came from Starbridge, which Lu fully owned. Starry's full ownership interest also appears in documentation executed by Jianhua for the Hotel Franchise Agreement and related construction loan.

The court was within its discretion to reject as not genuine the Amending Documents. (See *City of El Monte v. Ramirez* (1982) 128 Cal.App.3d 1005, 1011–1012 [trial court must "resolve various conflicts in the evidence and determine the credibility of witnesses, including the opinions of experts"].) Yan's handwriting expert questioned whether these documents were personally signed by Lu, who denied signing the 2014 Starbridge Meeting Minutes and denied reassigning shares to Shino.

Shino's theory for amending Starbridge's ownership is further belied by the documents on which she relies. In Shino's view, Lu received $3 million in return capital from the LLC in exchange for a reduced ownership interest. Lu's return of capital, however, was made after the 2013 Starbridge Shareholder Agreement that sought to establish Shino's majority (70%) ownership interest in Starbridge. Assuming the validity of this agreement, the 2014 Starbridge Meeting Minutes and 2014 LLC Resolutions reducing Starbridge's ownership interest in the LLC by 14.33% most negatively impacted *Shino*, not *Lu*. Shino could not explain this issue at deposition.

The evidence Shino and Jianhua provided was also vague, contradictory, and uncorroborated. The $10.9 million transfer to the LLC from AAMG was made during the same period AAMG

20

received $8.5 million, nearly half of which was contributed by Lu's affiliated company (Pt. VicValuta).  On these facts, we conclude substantial evidence supports the finding Lu held 100% (1,000) shares of Starbridge before selling them to Yan.

The stock sale, while admittedly "odd" and concerning, is also supported by substantial evidence.  The stock purchase is memorialized in various documents.  Shortly after its execution, Lu confirmed he liquidated his ownership of Starbridge.  The court credited Yan's declaration that neither she nor Li received purchase money back from the intermediaries.  (See *Caden C.*, *supra*, 11 Cal.5th at pp. 640–641; *Cornerstone Realty Advisors, LLC v. Summit Healthcare REIT, Inc.* (2020) 56 Cal.App.5th 771, 804–805 ["witness credibility is . . . within the exclusive province of the trial court, not us"].)

> 2.  *The Evidentiary Rulings Were Partially Incorrect, But Harmless*

Shino raises several arguments disputing the court's evidentiary rulings and consideration (or exclusion) of statements made by Bo Chen and Pakshu.  With two exceptions, Shino cites no statement(s) made by either declarant.  (See *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178, fn. 4 [citations to separate statement are not citations to evidence, as required under the Rules of Court]; *Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 317 [failure to comply with rules constitutes forfeiture of error].)  We nevertheless proceed to the merits.

We review the trial court's evidentiary rulings, including "its determination of issues concerning the hearsay rule," for abuse of discretion.  (*People v. Clark* (2016) 63 Cal.4th 522, 590.)  "'Specifically, we will not disturb the trial court's ruling "except

21

on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" [Citation.]  A miscarriage of justice results only if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*People v. Watson* (1956) 46 Cal.2d 818, 836.)" (*Briley v. City of West Covina* (2021) 66 Cal.App.5th 119, 132.)

###### a.   *Bo Chen Declaration*

Shino argues the trial court erred by admitting hearsay statements in Bo Chen's declaration in four respects.  "Hearsay is an out-of-court statement offered to prove the truth of its content." (*People v. Valencia* (2021) 11 Cal.5th 818, 831; see Evid. Code, § 1200, subd. (a).)  "Hearsay is generally inadmissible unless it falls under an exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 674; see Evid. Code, § 1200, subd. (b).)

First, Shino contends the trial court erred by admitting hearsay statements from Rongji and Lu concerning Lu's sale of his Starbridge shares to Yan.  Despite the court's limited admission of these statements to "explain Bo Chen's course of action"—why she would facilitate the sale of the Hotel—under Evidence Code section 1250, it appears Shino correctly notes the court's use of these statements as substantive evidence. Statements of a hearsay declarant's then-existing state of mind falls into an exception to the hearsay rule if "offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a)(2).)  This exception "applies only to statements offered to show the state of mind of the *declarant*, not the listener" (*People v. Luo* (2017) 16 Cal.App.5th 663, 677), and does not

22

"make admissible evidence of a statement of memory or belief to prove the fact remembered or believed." (Evid. Code, § 1250, subd. (b).)[11] To the extent the court relied on hearsay statements that Rongji funded the Hotel through Lu, who took title to the Hotel through Jianhua as facilitator, as substantive proof *or* to explain Bo Chen's conduct,[12] the court erred. To the extent it considered these statements to show the state of mind of Rongji or Lu explaining their participation in the Hotel sale and stock transfer, we discern no error.

Second, Shino contends the court erred by impliedly finding Bo Chen's statements sufficiently trustworthy under Evidence

---

[11] "Any statement of a past event is, of course, a statement of the declarant's then existing state of mind—[their] memory or belief—concerning the past event. If the evidence of that state of mind—the statement of memory—were admissible to show that the fact remembered or believed actually occurred, any statement narrating a past event would be, by a process of circuitous reasoning, admissible to prove that the event occurred." (Assem. Com. on Judiciary, com. on Evid. Code, § 1250.)

[12] In her declaration, Bo Chen stated that Rongji contacted her around June 2021 to help "sell one of his assets in the United States, . . ." Rongji told Bo Chen "he had funded the purchase of the Hotel in 2012 and his business associate [(Lu)] took the title of the Hotel on behalf of him. According to [Rongji], because he and Mr. Lu were both in China, they agreed to invest $20 million with [Jianhua] to facilitate the purchase of the Hotel and in exchange they agreed to give [him] 10% of the Hotel's profits." Rongji told Bo Chen "he was very upset with [Jianhua] because he had invested the money almost ten years ago but [Jianhua] never sent him any profits from the Hotel. [Rongji] told me that he no longer wanted to own the Hotel because he was not making any money from his investment and thought [Jianhua] was taking advantage of him." After Rongji and Lu "found a buyer," they confirmed Rongji's "intention to sell the Hotel and requested that [Jianhua] cooperate with me to facilitate the sale."

23

Code sections 1250 and 1252.  Shino forfeited this objection by not raising it below.  (*People v. Riccardi* (2012) 54 Cal.4th 758, 821, abrogated on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192.)  In any event, Shino's argument confuses the inquiry.  As discussed, state of mind exception and the trustworthiness prerequisite "applies 'to the statement made by the hearsay declarant . . . not to the testimony of the witness who relates the hearsay statement . . . .' [Citations.]" (*Riccardi, supra*, 54 Cal.4th at p. 821.)  Absent reasoned discussion on the hearsay declarants (Rongji, Lu,[13] and Jianhua), we shall not reject their trustworthiness.

Third, Shino contends the court erred by admitting Jianhua's hearsay statements as party admissions.  We disagree. In various corporate and underwriting documents, Jianhua is listed as agent and manager of Starbridge and the LLC.  In these roles, Jianhua represented the ownership interests of Starbridge, of which Shino alleged she is majority owner.  As such, Jianhua's statements were admissible party admissions.  (See Evid. Code, § 1220; *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 524 [statements by LLC manager]; *Los Angeles County Flood Control District v. Mindlin* (1980) 106 Cal.App.3d 698, 713 [agent]; *Dincau v. Tamayose* (1982) 131 Cal.App.3d 780, 789 [spouses with established relationship on subject matter].)  Jianhua's statements to Bo Chen were also admissible as inconsistent statements to his own declaration.  (See Evid. Code, § 1202; *People v. Zapien* (1993) 4 Cal.4th 929, 976 [reviewing courts uphold evidentiary rulings if correct on any theory].)

---

[13]     Shino retracts her discussion of Lu's "motive to fabricate" in her appellate briefs.

24

Fourth, Shino argues the court overruled various objections for lack of foundation. (See Evid. Code, § 702, subd. (a) [testimony of particular matter "is inadmissible unless [they have] personal knowledge of the matter"].) Of the rulings Shino identifies, all but one are correct.[14] The matters Bo Chen discussed related to Shino and Jianhua's claimed ability to capitalize the LLC and Hotel. These statements were based on her "long history" with Jianhua and Shino or were directly relayed by Jianhua.

b.    *Pakshu Chan Declaration*

Shino contends the trial court erred in excluding many statements appearing in Pakshu's declaration as lacking in foundation. In those statements, Pakshu declared: he was the owner of Starry; Bo Chen was trying to defraud his family in China; "we" (presumably his family) agreed to have Starry hold a minority interest in Starbridge "to be split 70–30 with Shino [and AAMG];" Lu was powerless to dispose Starbridge shares without his consent; and neither his family nor Lu received any part of Yan's $2 million transfer.

We discern no abuse of discretion in excluding these statements. (See *People v. Brooks* (2017) 3 Cal.5th 1, 46–47.) We concur in the lower court's assessment that Pakshu's declaration was not self-sufficient. (See Evid. Code, § 702, subd. (b) [witness's "own testimony" can establish personal knowledge].)

_____

[14]    Bo Chen lacked personal knowledge to attest Jianhua "would actually seek to meet people in a nice hotel where he was not staying, in order to create a nicer impression for himself given that otherwise [he] had limited financial means." (See *People v. Valencia* (2006) 146 Cal.App.4th 92, 103–104.)

The grounds on which Pakshu claimed personal knowledge—that he was "owner and financial backer of Starry," Rongji's son, and the first listed President of Starbridge—were either contradicted by significant corporate documents or insufficient to establish Pakshu's personal knowledge of Starbridge funding and ownership.[15]  (Compare *J&A Mash & Barrel, LLC v. Superior Court* (2022) 74 Cal.App.5th 1, 21 [corporate documents provided personal knowledge of partnership structure] with *Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248, 1270 [declarants offered "no real information" regarding personal knowledge].)

     c.     *Prejudice*

Erroneous evidentiary rulings require reversal "only if 'there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1449.)  Shino has not established prejudice from the erroneous evidentiary rulings.

The substantial evidence analysis conducted above does not include any of the improperly admitted statements appearing in Bo Chen's declaration.[16]  Thus, "[e]ven if we were to disregard

---

[15]    During the section 709 hearing, Shino relied on Rongji's hearsay statements to Bo Chen regarding *Rongji's* funding of the Hotel through Lu to demonstrate that Rongji's family, of which Pakshu is a member, were beneficial owners with knowledge about the Hotel's financing. The court rejected the argument:  "You can't sweep the whole family in.  It's one person."

[16]    Nor do we consider evidence Shino raised after the order from which this appeal was taken.  "It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment

26

this evidence, we would affirm the trial court's decision."
(*Daimler Trucks North America LLC v. Superior Court* (2022) 80 Cal.App.5th 946, 961.)

### DISPOSITION

The order denying Shino's petition and the resulting judgment are affirmed. Yan shall recover costs on appeal.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MORI, J.

We concur:

COLLINS, Acting P. J.

TAMZARIAN, J.

---

as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) We disregard the post-ruling evidence concerning the motion to intervene and deny Shino's request to take judicial notice of a Tennessee consent judgment invalidating a notary acknowledgement affixed to Yan's Purchase Agreement.